# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MORAD GHODOOSHIM, Individually and on Behalf of All Other Persons Similarly Situated, | **No. 12 Civ. 9264 (JSR)** |
|  | <u>**ECF Case**</u> |
| Plaintiff(s), |  |
| v. |  |
| QIAO XING MOBILE COMMUNICATION COMPANY, LTD., ZHI YANG WU, RUI LIN WU, DAVID LI, and KOK SEONG TAN, |  |
| Defendants. |  |

## MEMORANDUM IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND DEFAULT JUDGMENT

### POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP

600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Fax: (212) 661-8665

*Lead Counsel and Proposed Class Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ..................................................................................................................... 5

    I.     THE DEFAULT JUDGMENT SHOULD BE ENTERED
         AGAINST DEFENDANT QXM ..............................................................................5

    II.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23
         OF THE FEDERAL RULES OF CIVIL PROCEDURE ...............................................7

         A. Standards for Class Certification ...............................................................................8

         B. The Rule 23(a) Requirements ....................................................................................8

         C. The Requirements of Rule 23(b)(3) Are Satisfied....................................................12

    III.   POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR
         APPOINTMENT AS CLASS COUNSEL..................................................................23

CONCLUSION...................................................................................................................24

i

# TABLE OF AUTHORITIES

## CASES

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005) .......................................................................... 16

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ..................................................................................... 15, 19

*Amchem Prods. v. Winsdor*,
    521 U.S. 591 (1997) .......................................................................... 2, 7, 12, 13

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ...................................................................................... 8, 13

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ................................................................................ 11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................ 14

*Billhofer v. Flamel Technologies, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................ 8, 13, 15, 19

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) .................................................................... 13

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) .................................................... 16

*Central States Se. & Sw. Areas Health & Welfare Fund v.*
    *Merck-Medco Managed Care, LLC*,
    504 F.3d 229 (2d Cir. 2007) ............................................................................. 8

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ............................................................................... 22

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ................................................................... 13

*Darquea v. Jarden Corp.*,,
    No. 06 Civ. 722, 2008 U.S. Dist. LEXIS 17747 (S.D.N.Y. Mar. 6, 2008) ........................ 7

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ............................................................................ 10

*Dirks v. Clayton Brokerage Co.*,
    105 F.R.D. 125 (D. Minn. 1985)............................................................................. 22

*Du Pont v. Brady*,
    828 F.2d 75 (2d Cir. 1987)..................................................................................... 20

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985).................................................................................... 8

*Epifano v. Boardroom Bus. Prods., Inc.*,
    130 F.R.D. 295 (S.D.N.Y. 1990) .............................................................................. 7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ........................................................................................... 19

*Fogarazzo v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................................ 21

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)..................................................................................... 7

*General Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) ............................................................................................... 10

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968)..................................................................................... 2

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
    973 F.2d 155 (2d Cir. 1992)..................................................................................... 6

*HealthSouth*,
    261 F.R.D. at 637 .................................................................................................. 18

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95-CV-3431, 1999 U.S. Dist. LEXIS 22246 (E.D.N.Y. Apr. 23, 1999) .............. 8, 13

*In re Baldwin-United Corp. Litig.*,
    122 F.R.D. 424 (S.D.N.Y. 1986) ............................................................................ 11

*In re Beacon Associates Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010)..................................................................... 21

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................................... 2, 9

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Secs.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ................................................................... 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................ 10, 13

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
    574 F.3d 29 (2d Cir. 2009)............................................................................ 11

*In re Gaming Lottery Sec. Litig.*,
    No. 96-cv-5567 RPP, 2001 WL 204219 (S.D.N.Y. Mar. 1, 2001)................................... 18

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... 10

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009).................................................................... 16

*In re Herley Indus. Inc. Sec. Litig.*,
    No. 06-cv-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009)......................................... 18

*In re IGI Sec. Litig.*,
    122 F.R.D. 451 (D.N.J. 1988)....................................................................... 11

*In re Independent Energy Holdings PLC Sec. Litig.*,
    210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................. 2, 7, 8

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................ 10, 11

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).......................................... 16, 21

*In re Parmalat Sec. Litig.*,
    No. 04-cv-00030, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).............................. 19, 21

*In re Pfizer Secs. Litig.*,
    No. 04 Civ. 9866, No. 05 MD 1688, 2012 U.S. Dist. LEXIS 44330
    (S.D.N.Y. Mar. 29, 2012) ........................................................................... 16

*In re PHP Healthcare Corp.*,
    128 Fed. Appx. 839 (3d Cir. 2005).................................................................. 16

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ............................................................... 19

*In re Prudential Sec. Inc. Ltd. Pshps. Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................. 9, 10

*In re Sadia, S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ............................................................................ 20, 21

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008)................................................................................. 13

*In re Scor Holding (Switz.) A.G. Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)...................................................... 10, 23

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ............................................................................ 11

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001).................................................................................. 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ...................................................................... 9, 23

*In re Worldcom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................... 3, 13, 22

*United States v. Koenig*,
    388 F. Supp. 670 (S.D.N.Y. 1974)..................................................................... 21

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ....................................................................... 16

*Levitin v. PaineWebber, Inc.*,
    159 F.3d 698 (2d Cir.1998)................................................................................... 20

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
    967 F.2d 742 (2d Cir. 1992).................................................................................. 20

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997).................................................................................... 9

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011)................................................................................... 20, 21

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ............................................................................ 2

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010)................................................................... 7, 9, 22

*Merck-Medco Managed Care, LLC*,
    504 F.3d 229 (2d Cir. 2007).................................................................................... 8

*In re Winstar Commc'ns Sec. Litig.*,
    No. 01 CIV. 3014 GBD, 2013 WL 1700993 (S.D.N.Y. Apr. 17, 2013) ........................ 22

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
    639 F.3d 572 (2d Cir. 2011)................................................................................. 16

*Pasternak v. Upjohn Co.*,
    No. 92 CV 5987, 1994 U.S. Dist. LEXIS 21078 (E.D.N.Y. Sept. 19, 1994) .................. 12

*Phillips Petroleum v. Shutts*,
    472 U.S. 797 (1985)................................................................................... 7, 23

*Simpson v. Specialty Retail Concepts*,
    Inc., 823 F. Supp. 353 (M.D.N.C. 1993) ...................................................... 16

*Stengle v. American Italian Pasta Co.*,
    No. 05-0725, 2005 U.S. Dist. LEXIS 43816 (W.D. Mo. Dec. 19. 2005)........................ 24

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008)................................................................................. 19

*Teachers Ret. Sys. of Louisiana v. ACLN Ltd.,*,
    No. 01 Civ. 11814,  2004 U.S. Dist. LEXIS 25927 (S.D.N.Y. Dec. 20, 2004)............... 11

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)...................................................................... 7, 16, 17

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006)
    ,............................................................................................... 15

*Telford v. Ideal Mortgage Bankers, LTD.*,
    No. CV 09-5518, 2010 WL 3924790 (E.D.N.Y. Aug. 17, 2010).................................. 5, 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................. 23

*Top Tankers, Inc. Sec. Litig.,*,
    No. 06 Civ. 13761, 2008 U.S. Dist. LEXIS 58106 (S.D.N.Y. July 31, 2008)................... 2

*Trief v. Dun & Bradstreet Corp.*,
    144 F.R.D. 193 (S.D.N.Y. 1992) ................................................................ 7

U.S. Dist. LEXIS 17747 ............................................................................... 14

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) .......................................................... 9, 10, 16

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011)......................................................................................................... 8

## STATUTES

15 U.S.C. § 78j(b)…….......................................................................................................... 2

15 U.S.C. § 78t(a) ........................................................................................................... 2, 13

15 U.S.C. § 78u-4…………………………………………………………………….11, 12

## OTHER AUTHORITIES

"The Plaintiffs' Hot List." National Law Journal, (Oct. 3, 2011). ................................ 24

## REGULATIONS

17 C.F.R. §240.10b-5............................................................................................... 2, 8

Fed. R. Civ. P. 55 ....................................................................................................... 1

Fed R. Civ. P. 23(a) ................................................................................... 3, 8, 9, 10, 11

Fed. R. Civ. P. 23(b)…………….................................................................3, 12, 13, 22

Fed. R. Civ. P. 23(g) ............................................................................................ 23

Lead Plaintiff and Proposed Class Representative Morad Ghodooshim ("Mr. Ghodooshim" or "Lead Plaintiff"), submits this Memorandum in support of his motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure and for Default Judgment against Defendant Qiao Xing Mobile Communication Company, Ltd. ("QXM" or the "Company") pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Civil Rule 55.2.

## PRELIMINARY STATEMENT

This action was commenced on December 19, 2012. (Dkt. No. 1). On April 12, 2013, this Court appointed Mr. Ghodooshim as Lead Plaintiff (Dkt. No. 13). On April 17, 2013, Lead Plaintiff obtained a certificate of default against Defendant QXM for its failure to plead or defend in this action within the time period do so. (Dkt. No. 16-3).[1]

By this motion, Lead Plaintiff seeks entry of a default judgment against QXM for fifteen million, seven hundred fifty-six thousand, nine hundred seventy-eight dollars ($15,756,978). As detailed herein, an entry of default under Rule 55 of the Federal Rules of Civil Procedure is warranted against Defendant QXM because it has willfully failed to respond to the Class Action Complaint ("Complaint") in any way despite being properly served with the summons and Complaint.

Lead Plaintiff also seeks certification of the following class (the "Judgment Class") for the purpose of entering the Default Judgment against QXM:

> All purchasers of the common stock of Qiao Xing Mobile Communication Company, Ltd. during the period from September 10, 2010 to May 2, 2012, both dates inclusive (the "Class Period").[2]

---

[1] Lead Plaintiff is attempting to obtain addresses at which to serve the remaining defendants, and has consulted with a private investigator to locate these individuals.

[2] Excluded from the Judgment Class are defendants, officers and directors of QXM, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

Mr. Ghodooshim also seeks his appointment as the Class Representative and the appointment of Lead Counsel, Pomerantz Grossman Hufford Dahlstrom & Gross LLP ("Pomerantz"), as Class Counsel for the Judgment Class.

The Complaint asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), 15 U.S.C. § 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

Courts have consistently held that such claims are especially amenable to class certification. Indeed, "[t]he Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted); *In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class). *See also Amchem Prods. v. Winsdor*, 521 U.S. 591, 624 (1997); *Green v. Wolf Corp.,* 406 F.2d 291, 296 (2d Cir. 1968); *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 U.S. Dist. LEXIS 58106, at **28-29 (S.D.N.Y. July 31, 2008); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999).

In this class action, Lead Plaintiff seeks to prove that he, like other Judgment Class members, was injured by a common course of misconduct—the issuance of false financial statements and other material misrepresentations and omissions by QXM along with the individual defendants Zhi Yang Wu ("Z. Wu"), Rui Lin Wu ("R. Wu"), David Li ("Li"), and Kok Seong Tan ("Tan") (collectively, the "QXM Defendants") during the Class Period. The individual members of the proposed Judgment Class have relatively small damages that are not

feasible to pursue individually; accordingly, unless this action proceeds on a class basis, numerous investors will be left without any redress for defendants' securities law violations. *See In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification. The four prerequisites of Rule 23(a)—numerosity; commonality; typicality; and adequacy of representation—are easily met. In fact, this Court has already held in an earlier decision in this matter that Mr. Ghodooshim is an adequate plaintiff whose claims are typical of the Judgment Class. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. Thus, class certification is warranted.

## STATEMENT OF FACTS

Defendant QXM, a subsidiary of Qiao Xing Universal Resources Inc. ("XING"), manufactures and sells mobile handsets in the People's Republic of China ("China"). (¶¶20, 21).[3] The Company operates its business primarily through a 96.6%-owned subsidiary in China. (¶21). During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE"). (¶14).

QXM's Chief Executive Officers during the Class Period were Defendants Li and then Z. Wu. (¶¶15, 17). Defendant R. Wu was the Company's Vice Chairman of its Board of Directors. R. Wu was also Z. Wu's father, and the CEO and Chairman of XING until November 2011. (¶¶16, 20). Defendant Tan served as QXM's Chief Financial Officer until his abrupt departure on

---

[3] Unless otherwise stated, all references to "¶__" are to paragraphs in the Complaint.

3

May 2, 2012. (¶18).

The Complaint alleges that the QXM Defendants failed to disclose that Defendant R. Wu was siphoning money from the Company into his own personal account, and further, that the Company lacked the proper internal controls to prevent this type of conduct. (*See* ¶7, 27, 31). Specifically, the Complaint alleges that in June 2011, Defendant R. Wu improperly transferred funds from a subsidiary of XING, QXM's parent company. (¶31).

Investors only first learned of the improper transfer on April 20, 2012, after XING, the parent company, disclosed the existence of the improper transfer by R. Wu, that it had not been authorized by XING's Audit Committee, and that the matter was under investigation by the Audit Committee. (¶31). In response to this disclosure, QXM shares declined nearly 14% on April 23, 2012 on unusually heavy trading. (*See* ¶32).

Shortly after this announcement, QXM revealed that it had failed to file its annual report for 2011 due to "delays in obtaining certain required documents and information necessary for its public accounting firm to complete their audit procedures in a timely manner." (¶33). Although the Company stated it would file the report within the extension period provided by filing Form NT 20-F, QXM failed to do so within the time allotted, and did not provide any explanation. (¶¶33, 39).[4]

On May 2, 2012, QXM announced that CFO Defendant Tan had suddenly resigned, prompting another substantial drop in QXM's stock price (29% on unusually heavy trading).

---

[4] Although XING did not specifically identify which of its subsidiaries was the target of the fraudulent transfer, Plaintiffs have reason to believe that it was QXM because: (1) R. Wu served as both Vice Chairman for QXM and CEO and Chairman of XING at the time of the improper transaction, and thus had the control and the opportunity to effect the transfer (*see* ¶¶16, 20, 31); and (2) shortly after the improper transfer was disclosed to the market, QXM revealed that it was unable to file its audited financial information to investors for 2011, and that Defendant Tan, the Company's CFO, had resigned. QXM's auditor also resigned within a short period after the disclosure of the transfer (*see* ¶¶33, 34, 39).

(*See* ¶¶34, 35). A few minutes before the market closed that day, the NYSE halted trading on QXM shares. (¶36). A few days later, on May 8, 2012, QXM's independent auditor, Crowe Horwath, resigned. QXM did not disclose its auditor's resignation. (*See* ¶¶ 26, 39).

While trading was halted, the NYSE suspended trading on May 17, 2012. (¶37). The next day, QXM shares began trading on the over-the-counter market, where the stock price declined nearly 69% at the close of trading on May 18, 2012. (¶¶37, 38). After being delisted from the NYSE, QXM's shares were also removed from the over-the-counter market.[5]

## ARGUMENT

### I.     THE DEFAULT JUDGMENT SHOULD BE ENTERED AGAINST DEFENDANT QXM

In determining whether to grant a default judgment, the Court may consider numerous factors, including (1) "whether the defendant's default was willful; (2) whether the defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *See Telford v. Ideal Mortgage Bankers, LTD.*, No. CV 09-5518, 2010 WL 3924790, at *2 (E.D.N.Y. Aug. 17, 2010) (citation omitted).

Here, the summons and Complaint in this action was served upon Defendant QXM through service upon its registered agent on January 22, 2013. Exhibit B to the Affidavit of Murielle J. Steven Walsh in Support of Lead Plaintiff's Motion for Class Certification ("Walsh Aff.")  Despite being served over four months ago, Defendant QXM has failed to answer the Complaint or otherwise plead or defend in this action, and its time in which to do so has expired.

---

[5]     SEC     Release     No.     67718     (Aug.     23,     2012),     *available     at* http://www.sec.gov/litigation/admin/2012/34-67718.pdf.

Lead Plaintiff has thus obtained a signed and stamped Certificate of Default with respect to Defendant QXM. Walsh Aff., Ex. C.

A default judgment is warranted. Defendant QXM has willfully failed to respond to the Complaint in any way, despite being properly served with the Complaint. Moreover, since the Company has not filed an answer, there is no evidence of any defense. In addition, denying Lead Plaintiff's motion would be prejudicial to Plaintiffs as there are "no additional steps available to secure relief" in this Court against Defendant QXM. *See Telford*, 2010 WL 3924790, at *3.

As a result of Defendant QXM's default, the Company is deemed to concede "all well pleaded allegations of liability" with the exception of allegations that pertain to damages. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp*., 973 F.2d 155, 158 (2d Cir. 1992). As set forth in the Complaint, and in detail above, during the Class Period, Defendant QXM violated the Exchange Act § 10(b) and Rule 10b-5 by failing to disclose that Defendant R. Wu siphoned money from a subsidiary of QXM's parent company, and QXM lacked proper internal controls to prevent it.

Although Defendant QXM's default does not constitute an admission of damages, Lead Plaintiff has submitted evidence supporting his request for damages. The Complaint alleges that QXM's stock price dropped significantly on April 16, April 23, and May 2, 2012 in response to revelations of the Company's fraud. (¶¶29-32, 34-35).

Lead Plaintiff has submitted the declaration of an expert, Kenneth N. Kotz, who has calculated an estimate of the potential aggregate damages that resulted from these three disclosures. Mr. Kotz estimates that classwide damages are approximately $15,756,978. Declaration of Kenneth N. Kotz ("Kotz Decl."), ¶¶3(b), 31. The Kotz Declaration sets forth the methodology utilized in arriving at this estimate. Kotz Decl. ¶¶12-32.

## II.     THE CLASS SHOULD BE CERTIFIED PURSUANT TO
##         <u>RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>

The requirements for certification of a putative class under Federal Rule 23 are (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods.*, 521 U.S. at 613. In addition, the Court must determine whether the action is maintainable under Federal Rule 23 (b)(1), (2) or (3). *Id.* at 614. Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions … permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 808-809 (1985). "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 89-90 (D. Conn. 2010) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)). In this case, all of the criteria of Rule 23 (a) and (b) are met.

A class action is both an "effective and appropriate method for resolving securities law claims." *See Epifano v. Boardroom Bus. Prods., Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990) (citations omitted); *Independent Energy Holdings*, 210 F.R.D. at 479 (Class action treatment is "particularly appropriate" for securities fraud claims …."); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 197 (S.D.N.Y. 1992) ("The class action procedure is singularly suited for securities fraud actions . . ."). *See also Amchem Prods.*, 521 U.S. at 624; *Green v. Wolf Corp.*, 406 F.2d at 296. Indeed, courts have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 U.S. Dist. LEXIS 17747, at *12 (S.D.N.Y. Mar. 6, 2008) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990)). In other words, in a

securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification. *See Independent Energy Holdings*, 210 F.R.D. at 479; *see also Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150, 155 (S.D.N.Y. 2012) ("The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action.") (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)).

Here, the Complaint alleges precisely the type of securities fraud claims which have been routinely certified as class actions.

### A.   Standards for Class Certification

Certification of a class is proper only after a court undertakes a "rigorous analysis" under Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  While the Rule 23 inquiry may overlap with that of the merits, courts may not engage in "free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

### B.   The Rule 23(a) Requirements

#### 1.   *The Proposed Judgment Class Is So Numerous That Joinder of All Members Is Impracticable*

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable."  Impracticable does not mean impossible, but only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007);  *see also In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431, 1999 U.S. Dist. LEXIS 22246, at **18-19 (E.D.N.Y. Apr. 27, 1999) ("joinder need not be impossible to warrant class certification, but rather impracticable in the sense that requiring joinder 'would needlessly complicate and hinder efficient resolution of the litigation'") (citation

omitted). Further, a plaintiff need not allege the exact number or identity of class members.  *See Blech*, 187 F.R.D. at 103 ("Precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity.") (citations omitted).  However, "[j]oinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen, supra*, 270 F.R.D. at 90 (citing *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997)).

"[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.,* 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

A review of publicly-available information reveals that during the Class Period, on average, approximately 471,041 shares of QXM common stock were traded on the NYSE per week during the time that QXM was listed on that exchange. Walsh Aff., Ex. D, at 10. The NYSE is an active and efficient national market exchange. Although Lead Plaintiff has not at this time ascertained the precise number of potential Judgment Class members, he believes that there are many hundreds, if not thousands, of geographically dispersed members of the proposed Judgment Class. The precise identity of the members can be readily identified from the Company's books and records. Clearly, the proposed Judgment Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable. *See Menkes*, 270 F.R.D. at 90.

### 2.     *Questions of Law or Fact Are Common to the Class*

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. Ltd. Pshps.*

*Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995). *See also Dietrich v. Bauer*, 192 F.R.D. 119, 124

(S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the

context of securities fraud litigation"), *accord In re Global Crossing Sec. & ERISA Litig.*, 225

F.R.D. 436, 451-452 (S.D.N.Y. 2004).

There are numerous common issues prevalent in this case, including:

- whether the federal securities laws were violated by the QXM's acts as alleged in the Complaint;

- whether statements made by QXM to the investing public during the Class Period omitted and/or misrepresented material facts about QXM's business, operations and management of QXM;

- whether QXM acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of QXM securities during the Class Period were artificially inflated as a result of the alleged omissions and misrepresentations;

- whether the members of the Judgment Class have sustained damages and, if so, what is the proper measure of damages.

In comparable situations, courts have consistently found the commonality requirement to

have been satisfied. *See, e.g., In re Scor Holding (Switz.) A.G. Litig.*, 537 F. Supp. 2d 556, 571

(S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245

F.R.D. 147, 157-158 (S.D.N.Y. 2007); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D.

369 (S.D.N.Y. 2000).

### 3. Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the

claims of the class. The Supreme Court has acknowledged that the "commonality and typicality

requirements of Rule 23(a) tend to merge." *General Tel. Co. of the Southwest v. Falcon*, 457

U.S. 147, 157-58, n.13 (1982). "Typicality does not require that the situations of the named

representatives and the class members be identical." *Oxford Health Plans*, 191 F.R.D. at 375 (citation omitted); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998).

The focus of the inquiry is on defendants' actions, not on plaintiff's behavior. *See, e.g.*, *Teachers Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814,  2004 U.S. Dist. LEXIS 25927, at *11-*12 (S.D.N.Y. Dec. 20, 2004); *In re IGI Sec. Litig.*, 122 F.R.D. 451, 456 (D.N.J. 1988). Lead Plaintiff also meets Rule 23(a)'s typicality requirement. A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted).

In appointing Mr. Ghodooshim Lead Plaintiff, this Court held that he satisfies the typicality requirement because he "satisfies the requirements for lead plaintiff under the Private Securities Litigation Reform Act of 1995 ["PSLRA"]." April 12, 2013 Order (Dkt. No. 13) (citing 15 U.S.C. § 78u-4(a)(3)(B)). That decision should be affirmed.

### 4.   *Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class*

The Rule 23(a)(4) requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. In this regard, the focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation

omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625 (citation omitted). It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Mr. Ghodooshim has no conflicts with other class members.  Indeed, in appointing Mr. Ghodooshim as Lead Plaintiff, the Court found no evidence that he will not fairly and adequately protect the interest of the class, nor is he subject to unique defenses rendering him incapable of adequately representing the Judgment Class. *See* April 12, 2013 Order (Dkt. No. 13) (citing 15 U.S.C. § 78u-4(a)(3)(B)); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The proffer of the Pomerantz firm as Class Counsel also militates in favor of Mr. Ghodooshim's adequacy as a Class Representative. Pomerantz has extensive experience and reputation in the field of securities litigation. Its resume, attached as Exhibit E to the Walsh Affidavit, gives a sampling of its accomplishments in this area. Moreover, Pomerantz's vigorous pursuit of the Judgment Class's interests is well-documented in its advancement of the Judgment Class's claims before this Court, including, *inter alia*, its attempt to obtain a default judgment against the Company.

### C.    The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of litigating. *See Pasternak v. Upjohn Co.*, No. 92 CV 5987, 1994 U.S. Dist. LEXIS 21078, at *4 (E.D.N.Y. Sept. 19, 1994). These requirements are satisfied here.

### 1.  *Common Questions of Law or Fact Predominate*

"The predominance test is readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Prods.*, 521 U.S. at 625. To satisfy predominance, "a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008), *abrogated on other grounds, Amgen*, 133 S. Ct. 1184. *Flag Telecom,* 245 F.R.D. at 171; *Worldcom*, 219 F.R.D. at 287-88. Moreover, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 133 S. Ct. at 1196.

Here, the elements of the Sections 10(b) and 20(a) claims can be proven on a common basis. The misrepresentations and omissions were made in SEC filings and QXM press releases. Thus, "generalized proof" of the misleading statements will be offered. The same is true concerning proof of whether QXM issued such statements knowing or recklessly ignoring their falsity. *See Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) (common questions held to predominate where "[t]he proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct.").

Moreover, courts have consistently found that common issues of law and fact will generally predominate in actions, as here, alleging that materially false representations were made to large groups of investors. *See*, *e.g.*, *Arakis Energy*, 1999 U.S. Dist. LEXIS 22246, at *37 ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues") (citations omitted); *see also Billhofer*, 281 F.R.D. at 156 ("Common questions of law and fact are present where, as here, the alleged fraud

involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls.").

Additionally, Plaintiffs could establish the reliance (or transaction causation) element of their claims on a common basis through one of two ways:

First, under the "fraud on the market" theory, the price of a company's stock is deemed to have incorporated all material information regarding its business, thereby negating the necessity for proof of individual reliance by class members on the alleged misstatements. *Basic Inc. v. Levinson*, 485 U.S. 224, 245-47 (1988).  As the *Basic* Court stated:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." [*Id.* at 241-42 (citation omitted, alterations in the original).]

The Court further explained:

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action. [*Id.* at 247.]

In the Second Circuit, plaintiffs need only show that they purchased the shares "in an efficient market" for the presumption to apply. *See Darquea*, 2008 U.S. Dist. LEXIS 17747, at *11.  As discussed further below, Plaintiffs submit that the market for QXM securities during the Class Period was an efficient one.

Alternatively, the proposed Judgment Class is entitled to a presumption of reliance because the action alleges omissions of material facts by one with a duty to disclose. *See*

14

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972) (in a case involving "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.").

### i.        There Existed an Efficient Market for QXM Shares.

Under the efficient capital market hypothesis ("ECMH"), in an efficient securities market, a company's stock price reflects and incorporates all material, publicly available information about the company's business. This hypothesis has been empirically validated in numerous studies. *See, e.g.*, Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383, 383 (1970).

The following factors are relevant to the determination of whether the market for QXM securities was, in fact, efficient during the relevant time:

**NYSE Listing.** The fact that QXM securities were traded on the NYSE during the class period entitles Plaintiffs to a presumption that they traded on an efficient market.  "At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008); *accord Billhofer*, 281 F.R.D. at 159.

QXM's listing on the NYSE means that financial information about that company was readily available to investors, at a minimum, through the company's SEC filings. A company's listing on the NYSE or similar market demonstrates that investors have access to trading prices and volumes throughout the trading day. Rules of the national exchange require that investors buy at the lowest ask price and sell at the highest bid price prevailing at the time of their trade.

Because a national exchange brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to securities' values. *See In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 848 (3d Cir. 2005) (NYSE is one of the most efficient capital markets in the world); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (stock traded on the NYSE is presumed to trade on an efficient market); *Wagner*, 251 F.R.D. at 119 (same); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the New York Stock Exchange is not an efficient market.") (citation omitted).

*Cause-and-Effect Relationship between Unexpected Company News and Stock Price Response.* Additionally, Lead Plaintiff meets what is considered to be the most important of the so-called "*Cammer*" factors that are generally considered by courts in determining whether the market for a particular security is efficient: that the facts show a cause-and-effect relationship between unexpected corporate events or financial information releases and an immediate response in the security's price.[6]

The Second Circuit has held that "the most important *Cammer* factor is the 'cause and effect' factor—evidence that unexpected corporate events or releases caused an immediate response in the price of a security. This is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Secs.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (quoting *Teamsters*, 546 F.3d at 207, quoting *Cammer*, 711 F. Supp. at 1287). The court in *Teamsters* stated:

---

[6] The other *Cammer* factors include: whether the security trades at a large weekly volume; the extent of analyst coverage; the existence of market makers for the stock and the potential for arbitrage activity; and the company's eligibility to file a Form S-3 with the SEC. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). While Plaintiffs may not meet all of the *Cammer* factors in these circumstances, *Cammer* is not exclusive, and the plaintiff "is not required to show the existence of each of these factors" to establish market efficiency. *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted); *see also Simpson v. Specialty Retail Concepts, Inc.*, 823 F. Supp. 353, 355 (M.D.N.C. 1993).

Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price. An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship.

546 F.3d at 207-208.

Here, QXM's stock price reacted significantly to material, new and unexpected information about the Company. For example:

    i.    On September 8, 2010, (two days before commencement of the Class Period), XING announced that it proposed to take QXM private by acquiring all of QXM's remaining outstanding shares. XING proposed to issue 1.9 shares of its common stock plus $0.80 in cash per share to QXM shareholders. That day, QXM's stock price increased approximately 37.6% (up 37.5% net of industry returns)[7] to close at $3.55 per share. Walsh Aff., Exs. F, G.

    ii.    On January 6, 2011, QXM and XING announced that QXM's board of directors authorized XING's proposal to be put forward to QXM shareholders for their consideration. That day, QXM's stock price increased by approximately 14.9% (up 14.1% net of industry returns) to close at $5.55 per share. Walsh Aff., Exs. F, H, I, J, K.

    iii.    On April 7, 2011, QXM announced that the shareholder meeting to consider XING's proposal had occurred. The meeting was permanently adjourned and the proposed transaction was abandoned because an insufficient number of shareholders attended the meeting to satisfy the quorum requirements. That day, QXM's stock price declined by approximately 21.2% (down 22.3% net of industry returns) to close at $3.50 per share. Walsh Aff., Exs. F, L, M, N.

    iv.    On April 16, 2012, trading was halted on shares of XING, QXM's parent company, for its failure to satisfy NASDAQ's request for additional information.

---

[7] The daily return of a stock is the percentage change in its closing price from its closing price on the previous trading day. QXM was not listed on any indexes, but its returns were compared to those of a specialty index, the NASDAQ OMX China Technology Index ("CHXN9000"). CHXN9000 was selected because it tracks the performance of Chinese technology companies, including mobile phone manufacturers. *See* NASDAQ OMX China Technology Index Methodology, at 2, http://indexes.nasdaqomx.com/docs/methodology_NQCH9000.pdf (eligible stocks must be classified as technology under ICB code 9000); ICB Industry Structure and Definitions, at 6-7, http://www.icbenchmark.com/ICBDocs/Structure_Defs_English.pdf (ICB code 9000 includes telecommunications equipment).

(¶29). QXM's stock price dropped by approximately 14.9% (down 12.8% net of industry returns), to close at $0.80 per share. ¶¶29, 30; Walsh Aff., Exs. F, O.

v.    After the market closed on <u>April 20, 2012,</u> XING disclosed the internal investigation into the transfer of its subsidiary's funds into R. Wu's account. (¶31). On the next trading day, QXM's stock price dropped by approximately 13.9% (down 12.5% net of industry returns) to close at $0.71 per share on April 23, 2012. ¶32; Walsh Aff., Exs. F, P, Q, R, S.

vi.   On <u>May 2, 2012,</u> QXM announced the resignation of its CFO. (¶34). A few minutes before the market closed, trading was halted on the Company's shares. (¶36). QXM's stock price dropped by approximately 29.4% (down 29.4% net of industry returns) to close at $0.48 per share. ¶35; Walsh Aff., Exs. F, T, U.

Accordingly, this factor weighs heavily in favor of a finding of an efficient market for QXM stock.[8]

***Institutional Holdings***.  A high level of institutional ownership indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors, and therefore, efficient. *See HealthSouth*, 261 F.R.D. at 637 ("The fact that a large number of institutions actively traded HealthSouth notes demonstrates an efficient market throughout the class period."). Here, institutional investors held, on average, approximately 48% of QXM shares not held by insiders, which is further evidence of efficiency. *See* Walsh Aff., Ex. W.

***Autocorrelation.***  Another factor indicative of market efficiency is the absence of autocorrelation. *See, e.g., In re Gaming Lottery Sec. Litig.*, No. 96-cv-5567 RPP, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (evidence that stock "did not exhibit autocorrelation" supports a finding of market efficiency); *In re Herley Indus. Inc. Sec. Litig.*, No. 06-cv-2596, 2009 WL 3169888, at *14 n.16 (E.D. Pa. Sept. 30, 2009) (noting that level of autocorrelation is factor to be considered in determining market efficiency). The autocorrelation analysis tests for

---

[8] In addition, there was substantial news coverage of QXM, which appeared in over 200 articles and press releases during the Class Period. *See* Walsh Aff., Ex. V.

the presence of a statistical relationship between price changes on successive trading dates. *Billhofer*, 281 F.R.D. at 160. If new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient market. *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 277 (D. Mass. 2006). There was no significant autocorrelation of QXM's stock price over the course of the Class Period. Kotz Decl., ¶35.

Based on the above factors, Plaintiffs submit that they have proffered sufficient evidence that QXM securities traded in an efficient market, and are therefore entitled to the presumption of reliance under the fraud on the market doctrine.[9]

### ii.   The Proposed Judgment Class is Entitled to a Presumption of Reliance Because the Action Alleges Material Omissions by QXM.

Alternatively, even if the Court were to find that the market for QXM shares was not efficient, the proposed Judgment Class is entitled to a presumption of reliance because Plantiffs' allegations involve material omissions by QXM, in addition to misleading statements. *See Affiliated Ute*, 406 U.S. at 154; *In re Parmalat Sec. Litig.*, No. 04-cv-00030, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008) (applying *Affiliated Ute* presumption where plaintiffs alleged fraudulent conduct spanning misstatements and omissions).

Where there is "an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute*, 406 U.S. at 154). In this type of situation, because investors are unaware of the omitted information, the

---

[9] Plaintiffs do not need to prove loss causation to take advantage of the fraud-on-the-market presumption at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2187 (2011). However, even if this were required, Lead Plaintiff could easily meet this hurdle. As already detailed above at pp. 17-18, the revelations of QXM's fraud severely impacted the price of QXM shares.

record generally fails to provide a basis from which a court could evaluate how investors would have reacted if they were aware of the withheld information. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992).

Thus, if the "plaintiff proves that the facts withheld are material in the sense that a reasonable investor might have considered them important, reliance will be presumed." *Du Pont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (internal quotations omitted). This materiality standard is satisfied where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (citation and internal quotations omitted). *See Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir.1998) (omitted fact is immaterial if information is "so basic that any investor could be expected to know it"); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 308 (S.D.N.Y. 2010) (material facts include those "which may affect the desire of investors to buy, sell, or hold the company's securities").

Here, Plaintiffs allege several material omissions from QXM's public statements to investors:

- Defendant R. Wu, a QXM director and Vice Chairman of its Board of Directors, improperly transferred funds from QXM into his own personal bank account in June 2011. (*See* ¶¶16, 31);

- QXM was unable to provide shareholders with accurate and timely information regarding its current financial results, operations, or governance for the year ended December 31, 2011, resulting in its failure to file its Form 20-F for 2011 and its ensuing delisting from the NYSE. (¶33); and

- QXM lacked adequate internal and financial controls, as evidenced by the improper funds transfer by R. Wu, and the Company's inability to marshal the financial information necessary to meet its filing obligations under the federal securities laws. (*See* ¶¶7, 16, 27, 31, 33).

It cannot be reasonably disputed that the alleged omissions were material. For example, the fact that QXM's Vice Chairman diverted corporate funds for his own personal account unquestionably would have significantly "altered the total mix of information" made available to investors. *See Matrixx*, 131 S. Ct. at 1318. *See also United States v. Koenig*, 388 F. Supp. 670, 705 (S.D.N.Y. 1974) (noting it was conceded that had CEO and board member stolen subsidiary's assets, then the test of materiality would have been satisfied).

Similarly, omissions concerning a company's financial condition have been found sufficiently material for purposes of applying the *Affiliated Ute* presumption of reliance. *See, e.g.*, *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *8 (applying *Affiliated Ute* presumption where defendants "failed to disclose material facts that made the reporting of certain information and transactions, although perhaps not deceptive in themselves, otherwise misleading."); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 283 (S.D.N.Y. 2005) (reliance satisfied where company's "true financial condition" undisclosed).

In the Second Circuit, this presumption applies even in "mixed cases" involving both omissions and affirmative misrepresentations. As one court in this district has stated, "[e]ven where "plaintiff's claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005); *In re Sadia, S.A.*, 269 F.R.D. at 316 (applying *Affiliated Ute* presumption in "mixed" case involving both misrepresentations and omissions); *In re Beacon Associates Litig.*, 745 F. Supp. 2d 386, 409 (S.D.N.Y. 2010). Because the *Affiliated Ute* presumption of reliance applies to Plaintiffs' claims, reliance can be shown on a class-wide basis and is no barrier to class certification.

### 2.     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. *In re Winstar Commc'ns Sec. Litig.*, No. 01 CIV. 3014 GBD, 2013 WL 1700993, at *5 (S.D.N.Y. Apr. 17, 2013). "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Menkes*, 270 F.R.D. at 100 (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007)). Class treatment is often deemed superior in "negative value" cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *Menkes*, 270 F.R.D. at 100. Courts have universally recognized the superiority of class actions in cases alleging securities fraud. *See* p. 1-2, *supra*.

> The following factors are relevant to the superiority assessment:
>
> (A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23 (b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Judgment Class have little interest in pursuing individual actions.  The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *Worldcom,* 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered

economic loss of *de minimus* value); *Vivendi*, 242 F.R.D. at 92; *see also Phillips Petroleum Co.*, 472 U.S. at 809. A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct; it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 n.4 (2007) ("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets.") (citations omitted).

Moreover, there are hundreds, if not thousands, of Judgment Class members. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *Scor Holding*, 537 F. Supp. 2d at 579. It would also "risk disparate results among those seeking redress." *Id.*

Finally, there is no reason to expect any difficulties in the management of this case as a class action. Indeed, class actions of this size and complexity are common.

## III.   POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

Rule 23(g)(1)(A) sets out the factors a court must consider in appointing Class Counsel, including:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is highly qualified to serve as Class Counsel.

For over 75 years, the Pomerantz firm has litigated securities fraud cases under federal and state laws on behalf of institutional and individual investors in both class and individual

actions, and has set important precedents. Courts have routinely acknowledged the strength of Pomerantz's securities litigation services. For example, in *Stengle v. American Italian Pasta Co.*, the court  appointed Pomerantz as Lead Counsel, remarking that the firm: "has significant experience (and has been extremely effective) litigating securities class actions, employs several highly qualified attorneys, and possesses ample resources to effectively manage the class litigation and protect the class's interests." No. 05-0725, 2005 U.S. Dist. LEXIS 43816, at *27 (W.D. Mo. Dec. 19, 2005). Institutional Shareholder Services ranked Pomerantz third in the country in 2005 for the highest average settlement amount achieved on behalf of clients.[10] The National Law Journal named Pomerantz to the Plaintiffs' Hot List for 2011. The Firm was recognized for its work representing plaintiffs in securities litigation and ERISA-related actions.[11]

In this case, even though the case is still in the early stages, Pomerantz has already demonstrated its adequacy by vigorously pursuing the interests of all Judgment Class members, including pursuing a default judgment against Defendant QXM.

<u>CONCLUSION</u>

For the reasons stated herein and in the accompanying supporting affidavit, declaration, and exhibits, Lead Plaintiff respectfully requests that the Court issue an Order: (1) entering a default judgment against QXM for fifteen million, seven hundred fifty-six thousand, nine hundred seventy-eight dollars ($15,756,978); (2) certifying this action pursuant to Rule 23 as a class action and certifying the Judgment Class defined herein for the purpose of entering the Default Judgment; (3) appointing Morad Ghodooshim as the Class Representative;

---

[10] SCAS 50 for 2005.

[11] "The Plaintiffs' Hot List." National Law Journal (Oct. 3, 2011).

(4) appointing Pomerantz as Class Counsel; and (5) granting such other and further relief as the Court may deem just and proper.

Dated: May 3, 2013

Respectfully submitted,

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**

/s/ *Murielle Steven Walsh*
Murielle Steven Walsh
Marc I. Gross
Patrick V. Dahlstrom
Jeremy A. Lieberman
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Fax: (212) 661-8665
mjsteven@pomlaw.com
migross@pomlaw.com
pdahlstrom@pomlaw.com
jalieberman@pomlaw.com

*Lead Counsel and Proposed Class Counsel*